WISCONSIN POWER AND LIGHT COMPANY,
Petitioner-Appellant,

v.

PUBLIC SERVICE COMMISSION OF WISCONSIN,
Respondent-Respondent,

CITY OF WISCONSIN DELLS and
Municipal Electric Utilities of Wisconsin,
Intervenors-Respondents.

Court of Appeals

*No. 2008AP2823. Oral argument July 30, 2009.
—Decided October 29, 2009.*

2009 WI App 164

(Also reported in 777 N.W.2d 106.)

On behalf of the petitioner-appellant, the cause was submitted on the briefs of *Theresa M. Hottenroth* and *Michael S. Greiveldinger* of *Wisconsin Power and Light Company*, Madison. There was oral argument by *Jeffrey M. Gray*.

On behalf of the respondent-respondent, the cause was submitted on the brief of *Jennifer E. Nashold* and *David A. Ludwig* of the *Public Service Commission of Wisconsin*. There was oral argument by *David A. Ludwig*.

On behalf of the intervenors-respondents, the cause was submitted on the brief of *Anita T. Gallucci* and *Rhonda R. Hazen* of *Boardman, Suhr, Curry & Field, LLP*, Madison. There was oral argument by *Anita T. Gallucci*.

Before Dykman, P.J., Vergeront and Higginbotham, JJ.

¶ 1. VERGERONT, J. This appeal concerns the regulation of public electric utilities under WIS. STAT. § 196.495 (2007–08),[1] called the "anti-duplication statute." The Wisconsin Public Service Commission (PSC) issued a decision allowing the Wisconsin Dells Water and Light Utility (City electric utility) to provide electricity to several new condominium developments in a newly annexed area near the Chula Vista Resort. The foundation for the PSC's decision was its construction and application of its regulation, WIS. ADMIN. CODE § PSC 112.08(1) (May 2008),[2] and, specifically, its conclusion that the sewer lift stations owned by the City were "customers" of the City electric utility within the meaning of the regulation. WP&L asserts that the sewer lift stations cannot be "customers" of the City electric utility because they are municipal property.

¶ 2. We conclude that the PSC's construction of its regulation to encompass within the word "customer" a facility that is receiving and paying for electrical service from a municipal electric utility, even if that facility is owned by the municipality, is reasonable and is consistent with the language and purpose of the

---

[1] All references to the Wisconsin Statutes are to the 2007–08 version unless otherwise noted.

[2] All references to the Wisconsin Administrative Code are to the May 2008 version unless otherwise noted.

regulation and the purpose of the anti-duplication statute. We reach the same conclusion with respect to the PSC's application of this construction to the facts of this case. The PSC's construction and application of its regulation is therefore entitled to controlling weight. Accordingly, we affirm the circuit court, which affirmed the PSC.

## BACKGROUND

I. Anti-Duplication Statute and Rule

¶ 3. WISCONSIN STAT. § 196.495 regulates the service territories of public electric utilities by setting forth the standards for determining which utility has the right to serve a particular customer. The statute prohibits electric utilities from providing electric services to premises that are already receiving electric services from another utility. WIS. STAT. § 196.495(1m)(a). The statute also sets standards for determining which electric utility should be granted the sole right to serve a new customer's premises. If two electric utilities are competing to serve a new customer not already receiving electricity and one utility can reach the customer with an extension of less than 500 feet, while the extension for the other utility would be 500 feet or more, the utility whose extension would be less than 500 feet has the exclusive right to provide service. WIS. STAT. § 196.495(1m)(b). Section 195.495(1m)(b) provides that no public utility may:

> Make a primary voltage extension [a line 500 feet or more] to serve the premises of any person not receiving electric service and to which service is available from the facilities of another public utility ... through a secondary voltage extension ... [a line less than 500 feet].

WIS. STAT. § 196.495(1m)(b).[3] This is known as "the 500–foot rule." Where two competing utilities are both within less than 500 feet or are both 500 feet or more from the new customer, the customer may choose between them. *See Adams-Marquette Electric Coop., Inc. v. PSC*, 51 Wis. 2d 718, 731, 188 N.W.2d 515 (1971).

¶ 4. WISCONSIN STAT. § 196.495(1)(b) prescribes how an extension is to be measured:

> The length of an extension shall be measured as the air line distance between an existing local service distribution line that normally operates at less than 35 kilovolts and the nearest point on the principal building or facility to be served by a primary voltage extension or a secondary voltage extension.

¶ 5. In order to implement WIS. STAT. § 196.495(1)(b), the PSC has promulgated this regulation:

> [T]he measurement of an extension's length under s. 196.495(1)(b), Stats., shall be from an existing local service distribution line that is, or has been, actually used in rendering local service to a customer. A street light or security light is not a principal building or facility under s. 196.495(1)(b), Stats.

WIS. ADMIN. CODE § PSC 112.08(1).

¶ 6. With respect to a public utility's own property and facilities, the utility can extend electrical services regardless of where the property and facilities are located and the 500–foot rule does not apply. WIS. STAT. § 196.495(3).

---

[3] WISCONSIN STAT. § 196.495(1)(a) defines extensions less than 500 feet as "secondary voltage extensions," and extensions 500 feet or more as "primary voltage extensions."

¶ 7. The statute's purpose of avoiding the dupli-
cation of electrical services is intended to benefit the
consumer "through the resulting economies in produc-
tion." *Wisconsin Power & Light Co. v. PSC*, 45 Wis. 2d
253, 259, 172 N.W.2d 639 (1969).

II. Factual Background

¶ 8. In 2005 the City of Wisconsin Dells agreed to
annex two areas near the Chula Vista Resort, which
was about to undertake a major expansion to include
three new condominium complexes and other facilities.
Chula Vista sought annexation because it needed access
to the City's sewer and water systems. At the time of
annexation, WP&L was the only utility providing elec-
tric service to the area.

¶ 9. In order to serve the new development, the
City sewer utility and the City water utility had three
sewer lift stations[4] and a new well built. The sewer lift
stations and well needed electricity in order to operate.
The City electric utility filed an application with the
PSC seeking permission to build an electric distribution
line through the Chula Vista annexation area that
would connect to the new sewer lift stations.[5] WP&L

---

[4] A sewer lift station is a pumping station that moves
wastewater to a sewage treatment plant.

[5] The City of Wisconsin Dells is itself a public utility under
Wis. Stat. § 196.01(5)(a), which defines "public utility" to in-
clude cities and other municipalities (as well as private entities)
that "own, operate, manage or control any . . . plant or equip-
ment . . . for the production, transmission, delivery or furnish-
ing of heat, light, water or power . . . to or for the public."
However, we follow the PCS's decision in referring to the City
electric utility, the City water utility, and the City sewer utility
as the entities that provide the respective services. The precise

objected because it already had lines in the annexed areas and had been serving the original Chula Vista Resort for years. In a 2005 decision, the PSC authorized the City electric utility to construct an electric distribution line in order to provide electricity to the three sewer lift stations.[6] The PSC relied on the provision in WIS. STAT. § 196.495(3) that allows public utilities to extend electric service to their own property or facilities.

¶ 10. The three new Chula Vista Resort condominium complexes were each built within less than 500 feet of the City electric utility's new sewer lift station line. After the completion of the complexes, the City electric utility began providing electricity to them. Two of the complexes—the Rio Condominiums and the Fairway Villas Condominiums—were located in an area for which WP&L had previously been the only provider of electricity.

¶ 11. The third condominium complex—the Cold Water Canyon Condominiums—was located in an area that was previously vacant land and lacked any electrical service at the time of annexation. The City electric utility built a distribution line from its sewer lift station line to provide electricity to this complex. Although WP&L had never serviced this area, its already existing distribution line was located less than 500 feet from this complex.

¶ 12. WP&L filed a complaint and petition for declaratory ruling with the PSC alleging that the City electric utility had improperly begun providing electric-

---

relationship among these three "utilities" is not clear from the record, nor is it clear how the "sewer utility" relates to the definition of "public utility" in § 196.01(5)(a). However, it is not disputed that the City owns and operates the facilities and property of the three "utilities."

[6] *Application of the City of Wisconsin Dells*, Certificate and Order, Docket No. 6610–CE–101, 2005 WL 3464863 (PSC, Nov. 22, 2005).

ity to the three condominium complexes, in violation of WIS. STAT. § 196.495. WP&L sought a ruling that it had the exclusive right to provide electric service in the annexed areas.

¶ 13. In a 2007 decision, the PSC ruled that, pursuant to WIS. STAT. § 196.495(1m)(a), WP&L had the exclusive right to serve the Rio Condominiums because this complex constituted premises already receiving electric service from WP&L. With respect to the two other complexes, the PSC ruled that, since both WP&L and the City electric utility had existing lines less than 500 feet from these, the developer had the right to choose the City electric utility as its electric provider.

¶ 14. In deciding that the City electric utility had an existing line less than 500 feet from these two condominium complexes, the PSC measured from the sewer lift station line. The PSC rejected WP&L's argument that, because the sewer lift stations were the City electric utility's own property under WIS. STAT. § 196.495(3), the sewer lift station distribution line was not providing electric services to a "customer" under WIS. ADMIN. CODE § PSC 112.08(1). The PSC concluded that "a municipal electric utility is serving a 'customer' under [the regulation] when it is serving municipal facilities."[7] The PSC found there was insufficient evidence that the City electric utility installed the sewer lift station line merely as a pretext so that it could locate facilities less than 500 feet from the condominiums.

¶ 15. The PSC also rejected WP&L's challenges to the size of the sewer lift stations and to the City electric

----

[7] *Wisconsin Power and Light Co. Compl. Against the City of Wisconsin Dells*, Final Decision, Docket No. 6680–DR-110, 2007 WL 1813626 (PSC, June 6, 2007).

utility's authority to build the sewer lift station line so far into WP&L's service territory, ruling that these issues had already been decided by the PSC's 2005 decision authorizing the construction of that line. The PSC stated that, if WP&L had wanted to challenge the 2005 decision, it should have appealed within thirty days of that final order.

¶ 16. WP&L sought judicial review of the PSC's decision pursuant to Wis. Stat. § 227.52, and the circuit court affirmed. The court concluded that the PSC's interpretation and application of its regulation, Wis. Admin. Code § PSC 112.08(1), was reasonable and consistent with the anti-duplication statute.

## DISCUSSION

¶ 17. On appeal WP&L challenges the PSC's construction and application of Wis. Admin. Code § PSC 112.08(1), asserting that construing the sewer lift stations to be the City electric utility's "customers" is inconsistent with the holding in the 2005 PSC decision that considered the sewer lift stations to be the City electric utility's "own property or facilities" under Wis. Stat. § 196.495(3). WP&L urges us to adopt an interpretation of the PSC regulation based upon a dictionary definition of "customer" as "a person who purchases goods or services *from another.*" Random House Dictionary (2009), http://www.dictionary. reference.com (last visited Nov. 25, 2009) (emphasis added). WP&L argues that, because the sewer lift stations and the City electric utility are both owned by the City, the sewer lift stations are not purchasing electricity from "another," and therefore cannot be a "customer" of the City electric utility. According to WP&L, a definition of "customer" that excludes a facility owned by the electric service

provider is necessary in order to serve the purposes of the anti-duplication statute.

¶ 18. In an appeal involving an administrative agency's decision, this court reviews the decision of the administrative agency, not that of the circuit court. *DOR v. Menasha Corp.*, 2008 WI 88, ¶ 46, 311 Wis. 2d 579, 754 N.W.2d 95. The interpretation of an administrative regulation, like the interpretation of a statute, is a question of law, which is generally subject to de novo review. *See id.*, ¶ 44. However, an agency's interpretation of its own regulation is controlling unless it is plainly erroneous or inconsistent with the language of the regulation. *Id.*, ¶ 53. In applying this controlling weight deference, we ask "whether the agency's interpretation is reasonable and consistent with the meaning or purpose of the regulation." *Id.*, ¶ 54 (citation omitted). If it is, we do not substitute our view of the law for that of the agency and we uphold its interpretation of its regulation even if an alternative view is as reasonable or more reasonable. *Id.*

¶ 19. Although WP&L's challenge is to the PSC's construction and application of its regulation, WP&L argues that we should give due weight deference, relying on case law addressing review of an agency's construction of a statute. Under that line of cases, courts apply one of three levels of deference to an administrative agency's interpretation of a statute: great weight, due weight, or no weight. *Id.*, ¶ 47. The only issue of statutory interpretation identified by WP&L is the PSC's determination that the sewer lift stations are the City electric utility's own property under WIS. STAT. § 196.495(3), but that was a determination made in the 2005 decision, which is not the subject of review in this

action.[8] Accordingly, we are satisfied that the controlling weight standard applies in reviewing WP&L's challenge to the construction and application of the PSC regulation.

¶ 20. We begin our analysis by considering the meaning and purpose of Wis. Admin. Code § PSC 112.08(1). The regulation plainly states that it is to be

---

[8] WP&L attempted to intervene in the 2005 PSC proceeding, but the PSC determined that WP&L was not an interested party. However, the PSC stated: "Should it come to pass in the future that Wisconsin Dells would seek to extend or render service to a WP&L customer in violation of Wis. Stat. § 196.495(1m), remedies are available at the Commission upon complaint of WP&L . . . ." *Application of the City of Wisconsin Dells*, Certificate and Order, Docket No. 6610–CE-101, p. 6, 2005 WL 3464863 (PSC, Nov. 22, 2005). WP&L did not appeal the PSC's 2005 decision allowing the City Electric Utility to serve the sewer lift stations.

In its appellate briefs WPL appeared to be challenging the 2005 PSC decision. However, at oral argument WPLs counsel stated, as we understand, that WPL was not asserting that it could now appeal the 2005 decision. In the event we are mistaken about WP&L's current position on this point, we state our agreement with the circuit court that the correctness of the 2005 decision is not before us. Even though WP&L's intervention motion was denied, WP&L had the right to petition for judicial review if it was "aggrieved" by the PSC's decision, Wis. Stat. § 227.53(1), and the definition of "person aggrieved" does not require the person to have been a party before the administrative agency. *See* § 227.01(9) (" 'Person aggrieved' means a person or agency whose substantial interests are adversely affected by a determination of an agency."). Because WP&L did not appeal the 2005 decision within the time limits specified in § 227.53, neither the circuit court nor this court may now consider a challenge to that decision. *See Gimenez v. State Medical Examining Bd.*, 229 Wis. 2d 312, 321, 600 N.W.2d 28 (Ct. App. 1999).

applied when measuring an extension's length under WIS. STAT. § 196.495(1)(b). As already noted, the length of the extension—in particular, whether it is less than 500 feet—is critical to determining the rights of competing electric utilities to serve a new customer under § 196.495(1m)(b). The regulation adds further definition to the beginning point and ending point of an extension. Section 196.495(1)(b) describes the beginning point as an existing local service distribution line that normally "operates at less than 35 kilovolts," and the regulation further defines an "existing local service distribution line" to be one "that is, or has been, actually used in rendering local service to a customer." WIS. ADMIN. CODE § PSC 112.08(1). With respect to the ending point, the statute provides that it is "the nearest point on the principal building or facility to be served by a primary voltage extension [500 feet or more] or a secondary voltage extension [less than 500 feet]." WIS. STAT. § 196.495(1)(b). The regulation further defines the "principal building or facility" to exclude a "street light or security light." WIS. ADMIN. CODE § PSC 112.08(1).

¶ 21. The regulation's evident purpose in further defining the beginning and ending points of the extension is to prevent certain methods of undermining the 500–foot rule. WP&L does not dispute that this is the purpose. The requirement that the line measured from must be, or have been, "actually used to serve a customer" prevents a utility from benefiting by building a line solely for the purpose of establishing a closer beginning point from which to measure an extension. The exclusion of streetlights and security lights as the ending point for an extension prevents a utility from placing these easily installed and relatively minor consumers of energy so as to be less than 500 feet from the existing distribution line when the buildings or facili-

ties of the hoped-for new customer are a greater distance from the existing line. *See Compl. of Polk-Burnett Coop.*, Order, Docket No. 4220–DR-106, 1995 WL 447324 (PSC, June 30, 1995) (explaining that allowing streetlights and security lights to be considered "the primary building or facility to be served" would encourage utilities "to install lights wherever necessary to circumvent the 500–foot rule.")

¶ 22. We next turn to the facts in this case. The PSC held an evidentiary hearing on the questions of whether and how the City electric utility was billing the City sewer utility and the City water utility for the electrical services it was providing through the sewer lift station line. The PSC found that the City electric utility had properly billed the City sewer utility and the City water utility for those services and they had properly paid the bills. The PSC found that the City electric utility "treated its sister municipal utilities the same as private customers, offering them no preferential service."[9] The PSC also found that the sewer lift station line "is used and useful" and was not built as a

---

[9] In its decision the PSC agreed with the City electric utility that it was obligated by the "anti-discrimination" statutes, Wis. Stat. §§ 196.22, 196.37 and 196.60, to treat the City water and sewer utilities as it does all other non-municipal customers and thus they are customers under those statutes. These statutes, generally, require public utilities to charge and receive the scheduled rates for any service they perform, § 196.22, and impose penalties for charging or receiving "from any person" more or less than the scheduled rates or the amount it charges or receives from "any other person for a like contemporaneous service." § 196.60. WP&L questions whether these statutes apply to the facts in this case, but it does not develop an argument to show that they do not. Accordingly, we accept the PSC's conclusion of law on the requirements of the anti-discrimination statutes.

pretext to circumvent the 500–foot rule. WP&L does not challenge these factual findings.

■

¶ 23. Given the facts found by the PSC, its conclusion that the City water and sewer utilities were "customers" within the meaning of the regulation is a reasonable construction and application of the regulation. This conclusion is consistent with the language and purpose of the regulation because it ensures that the measurement for purposes of the 500–foot rule will begin with a line that is actually providing electrical services for a non-pretextual purpose rather than a line that was built in order to circumvent that rule.

¶ 24. We disagree with WP&L that this construction and application of the regulation gives an unreasonable meaning to "customer." The dictionary definition on which WP&L relies—"a person who purchases goods or services *from another*" (emphasis added)—does not purport to define what "another" means. This definition simply raises a new set of questions on what "another" means in the context of municipal electric

WP&L also challenges the relevance of the anti-discrimination statutes to an interpretation of "customer" in Wis. Admin. Code § PSC 112.08(1), because, WP&L asserts, the anti-discrimination statutes and the anti-duplication statutes have different purposes. While that is undoubtedly true, it does not follow that the fact that the City electric utility treats the other two City utilities as it treats other customers in charging and collecting for services is irrelevant to the PSC's determination of whether those utilities are "customers" within the meaning of the regulation. At bottom WP&L's objection to consideration of the anti-discrimination statutes is that, whatever the actual transaction is between the City electric utility and the other two City utilities, the latter two are not "customers" under the regulation because they are all owned and operated by the City. We address this argument in the body of the opinion.

utilities providing services to municipal facilities. We also observe that other dictionary definitions do not contain the qualifier of "from another." *See, e.g.,* "One that buys goods or services," THE AMERICAN HERITAGE COLLEGE DICTIONARY 341 (3rd ed. 1993); "one that purchases some commodity or service . . . one that purchases systematically or frequently . . . ." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 559 (1993). Most importantly, the PSC is not obligated to consult a dictionary to interpret a term that it uses in its own regulation in a technical context. Instead, it may use its expertise and experience to give the term a meaning, as long as it is a reasonable one. It is reasonable to decide that a facility that receives electric service from a municipal electric utility and is billed for that service and pays for it on the same terms as all other persons or entities that receive service from the utility is a "customer" of that utility, even if the facility is owned by the same municipality.

¶ 25. WP&L also argues that its proposed definition of "customer" furthers the purpose of the anti-duplication statute, whereas the PSC's construction does not. Again we disagree. According to WP&L, the PSC's interpretation of "customer" encourages utilities to make "unilateral and self-interested decisions" about where to place their own facilities in order to use those lines as the beginning point for extensions to new areas. This argument ignores the fact that the PSC has found that the sewer lift station line is not a pretext, is "used and useful," and that the sewer lift stations were placed where they are because of gravity concerns. The PSC can make a similar inquiry in any case where the contention is made that the placement of a utility's facility is a pretext in order to circumvent the 500–foot rule.

¶ 26. As the PSC's counsel explained at oral argument, WP&L's interpretation of "customer" to exclude

in all cases a facility owned by a utility is inconsistent with the purpose of the anti-duplication statute. A distribution line that serves a facility of a utility, such as a lift station or the utility's administrative office building, could then not branch off to serve another's property that needs service even if it were less than 500 feet away. A longer extension would need to be built to reach the new property. This is contrary to the purpose of the anti-duplication law, which is to benefit the consumer by avoiding unnecessary costs of providing services. *See Wisconsin Power & Light Co.*, 45 Wis. 2d at 259.

## CONCLUSION

¶ 27. We conclude that the PSC's interpretation of "customer" in WIS. ADMIN. CODE § PSC 112.08(1) to encompass a facility that is receiving and paying for electrical service from a municipal electric utility, even if that facility is owned by the municipality, is reasonable and is consistent with the language and purpose of the regulation and the purpose of the anti-duplication statute. We reach the same conclusion with respect to the PSC's application of the regulation to the facts of this case. We therefore give the PSC's construction and application controlling weight, and we affirm the circuit court.

*By the Court.*—Order affirmed.