Daniel J. VIDMAR, Petitioner-Appellant,

v.

MILWAUKEE CITY BOARD OF
FIRE POLICE COMMISSIONERS,
Respondent-Respondent.

Court of Appeals

*No. 2015AP1832. Submitted on briefs May 3, 2016.*
*—Decided November 15, 2016.*

2016 WI App 93

(Also reported in 889 N.W.2d 443.)

On behalf of the petitioner-appellant, the cause was submitted on the briefs of *Brendan P. Matthews* of *Cermele & Matthews, S.C.* of Milwaukee.

On behalf of the respondent-respondent, the cause was submitted on the brief of *Grant F. Langley*, City Attorney, and *Maurita Houren*, Assistant City Attorney.

Before Curley, P.J., Kessler and Brash, JJ.

¶ 1. BRASH, J. Daniel J. Vidmar appeals an order affirming the decision of the Milwaukee City Board of Fire and Police Commissioners (Board) to permanently discharge him from his employment as a police officer with the Milwaukee Police Department (Department). Vidmar makes the following arguments on appeal: (1) the Board proceeded on an incorrect theory of law; (2) the circuit court wrongly concluded that deference was owed to the Board's findings of fact and credibility determinations; and (3) the circuit court erred by applying an incorrect standard of review. We disagree and affirm.

### BACKGROUND

¶ 2. Vidmar began working as a police officer for the Department in December 2004. In August 2012, Vidmar was working in the bicycle unit at the District 7 station.

¶ 3. On August 18, 2012, Officer Joseph Newell took possession of a dirt bike in connection with an arrest for disorderly conduct. When a bike is retrieved as part of an arrest, it is tagged with a number for inventory purposes. After the identifying number and a description of the bike are entered into the Department's computer system, a document entitled "Officer Drop Receipt" is generated. The "Officer Drop Receipt" is used by the Department to track property that it seizes. Officer Newell entered into the computer system that the person he arrested indicated that the dirt bike did not belong to him. The dirt bike was placed in the District 7 station inventory room for storage.

¶ 4. The Department has a standard operating procedure for disposing of bicycles that come into police possession, but are not claimed. It states in relevant part:

## 560.80 BICYCLES, MOPEDS, AND MINI-BIKES

Bicycles, mopeds, and mini-bikes less than 51 cc shall be maintained at all District Stations and processed in the following manner:

. . . .

C. Prior to initiating the disposal process on an inventoried bicycle, moped, or mini-bike, NCIC and CIB shall be checked a second time for stolen/wanted and the printout must be attached to the white copy of the *Property Inventory*.

D. Bicycles, mopeds, and mini-bikes will be retained for thirty (30) days if ownership cannot be established. If the owner is known, complete and mail a *Property Release Letter* (Form PP-47) to the owner and attach a copy of the letter to the original inventory. The bicycle, moped, or mini-bike shall be retained for thirty (30) days from the date of the *Property Release Letter* being mailed.

. . . .

F. All bicycles, mopeds, or mini-bikes or parts thereof, not returned to the lawful owner or claimant shall be maintained at each district station.

G. Property Control will dispose of all unclaimed bicycles not picked up by the owner or claimant.

H. Disposal of bicycles shall be done expeditiously and in accordance with City Ordinance 102.11(6)(7).

I. Bicycle disposal generated revenue will be deposited in the Milwaukee Police Department's Bicycle Equipment Special Purpose Fund in accordance with City Ordinance 304.25.5.

(Some formatting changed; italics in original).

¶ 5.  In late August 2012, Vidmar saw the dirt bike in the inventory room at the District 7 station and thought it would be good for his son. Vidmar asserts that he contacted the Department's Property Control Division and was advised that if the dirt bike was unclaimed after thirty days in inventory, he could claim it as long as someone else was listed as the claimant. Vidmar waited thirty days and filled out a PO-5 "Order for Property" form, omitting the date and description of the dirt bike.[1] In the space for the property claimant's name, Vidmar wrote "Mark Dempski." Vidmar took the PO-5 form to Sergeant Lawrence Mueller and asked him to sign the form to release the dirt bike. Sergeant Mueller testified that he signed the form because he trusted that the information Vidmar provided was correct. Vidmar took the bike home a few days later.

¶ 6.  During the summer of 2012, Officer David Ziebell was assigned the task of auditing all bicycles inventoried at each of the Department's district stations. In reviewing the PO-5 form associated with the dirt bike, Officer Ziebell noticed that it was incomplete. The name listed on the form was also familiar to him—Mark Dempski—although the person Officer Ziebell knew spelled it "Demski."[2] Officer Ziebell confirmed that Mark Demski had not claimed the dirt bike, and, after further investigation, discovered that the dirt bike was in Vidmar's possession. Soon thereafter, Vidmar returned the dirt bike to the District 7 station.

¶ 7.  Officer Ziebell brought the PO-5 form to Lieutenant Robert Menzel, who contacted Captain

---

[1] A PO-5 form is used by the Department to document the release of inventoried property.

[2] The correct spelling is Mark Demski.

Regina Howard. Subsequently, Vidmar met with Captain Howard regarding the incident, although it is disputed who initiated this meeting. Captain Howard advised Vidmar that his actions were improper and provided him with a copy of the Code of Conduct. Captain Howard did not refer the matter to Internal Affairs. The conversation between Captain Howard and Vidmar would likely have marked the end of this matter if not for an anonymous letter sent to the Board. This letter, dated November 19, 2012, states in relevant part:

> Lt. Menzel, acting captain at Property the [sic] Division, found out a District 7 officer, Daniel Vidmar, filed [sic] out an inventory form involving a bicycle worth approximately $1500.00. Officer Vidmar waited a certain amount of time and then decided to release the bicycle to himself, he took the bike by falsify [sic] paperwork. Officer Vidmar, but [sic] a false claimant down, forged a person's name and walked out of District 7 with the bike, while he was being carried as Injured on Duty.
>
> Lt. Menzel knew this, called Capt. Howard and District 7 and they both wept [sic] this under the rug. Lt. Menzel said Capt. Howard owes him a favor now. This was clear cut theft and forgery. Officer Zibel [sic] from the Property Division called the claimant, whom [sic] Officer Vidmar's report [sic] took the bike. The individual said he never received a bike from the Milwaukee Police Department.
>
> All Capt. Howard did was call Officer Vidmar and tell him to return the bike. The rest was never investigated.

This letter triggered a more thorough investigation by the Department.

¶ 8.    The Department's Internal Affairs Division is divided into two sections:    the Special Investigation Section, which investigates allegations of criminal conduct logged against members of the Department, and the Internal Affairs Section, which investigates Department rule and conduct violations. The Special Investigation Section brought the case to the Milwaukee County District Attorney's office. Chief Deputy District Attorney Kent Lovern reviewed the criminal investigation reports. On August 6, 2013, Lovern sent a letter to Chief Edward Flynn that the District Attorney's Office decided not to criminally charge Vidmar with theft. The letter further stated, however, that the District Attorney's Office would no longer use Vidmar as a prosecution witness. Specifically, the letter states:

> Vidmar's actions in obtaining the bicycle undermine his ability to testify in future proceedings for the District Attorney's Office. By his own admission, Vidmar completed and filed an official Milwaukee Police Department report under false pretense in order to gain a personal benefit. This matter would necessarily be raised as an attack on Officer Vidmar's credibility in every future matter in which he filed a police report that served as the basis for a criminal prosecution. As a result, this office will not use Officer Vidmar as a witness in future proceedings.

¶ 9.    On September 19, 2013, Assistant United States Attorney Paul Kanter sent a letter to Lieutenant Derrick Harris of Internal Affairs stating that if Vidmar were to be called to testify as a witness in federal court, his office would be required to disclose the Department's investigation regarding the dirt bike. Moreover, Deputy City Attorney Rudolph Konrad told the Department that the Milwaukee City Attor-

ney's office would not rely on or call Vidmar as a witness for cases in municipal court because this incident would result in Vidmar being "considered a non credible witness."

¶ 10. When the criminal investigation concluded, Internal Affairs began its investigation to determine whether Vidmar violated the Department's Code of Conduct and other rules. This investigation was supervised by Lieutenant Johnny Sgrignuoli. At the conclusion of this investigation, Lieutenant Sgrignuoli prepared a memorandum, dated November 5, 2013, summarizing his review of the investigation and recommending that charges be brought against Vidmar. On November 22, 2013, Deputy Inspector Michael Brunson, Commander of Internal Affairs, filed charges against Vidmar. On January 8, 2014, Chief Flynn discharged Vidmar for the following violations of the Department's Rules and Procedures:

1. Core Value 3.00—Integrity, referencing Guiding Principle 3.05: Failure to obey the laws in effect in the state of Wisconsin.

2. Core Value 3.00— Integrity, referencing Guiding Principle 3.10: Failure to be forthright and candid on an official department report.

3. Core Value 1.00—Competence, referencing Guiding Principle 1.02: Lacking the capacity to enforce federal and state laws, and city ordinances.

¶ 11. Vidmar appealed his discharge to the Board. On May 12, 2014, the Board conducted a hearing on this matter. On June 26, 2014, the Board issued a written decision. The Board dismissed the first charge—failure to obey state laws—finding that the City did not prove by a preponderance of the

evidence that Vidmar could reasonably be expected to have had knowledge of the probable consequences of taking the dirt bike from District 7. For the second charge—failure to be forthright and candid on an official department report—the Board found that the City met its burden, but reduced the penalty to a sixty-day suspension without pay. The Board sustained the third charge—lacking the capacity to enforce federal and state laws and city ordinances—finding that Vidmar's inability to testify as a prosecutorial witness was a violation of Core Value 1.00, Guiding Principle 1.02. The Board sustained Vidmar's discharge for the third charge.

¶ 12. Vidmar made a timely appeal of the Board's decision to the circuit court in accordance with WIS. STAT. § 62.50(20) (2013–14)[3] and additionally filed a corresponding petition for a writ of *certiorari*. The circuit court consolidated these appeals. At the circuit court, Vidmar only challenged the Board's determination that he lacked capacity to enforce the law and its affirmance of his discharge. Specifically, Vidmar argued in the circuit court that "double jeopardy" precluded Chief Flynn from discharging him, and that there was insufficient evidence to support the Board's finding that he violated Core Value 1.00, Guiding Principle 1.02, or to support his discharge for this violation. The circuit court analyzed both of Vidmar's arguments under his statutory appeal, affirming the Board's determination. The circuit court dismissed the *certiorari* action based on its conclusion that it was merely a reiteration of Vidmar's statutory argument. This appeal follows.

---

[3] All references to the Wisconsin Statutes are to the 2013–14 version unless otherwise noted.

## Discussion

■■■■■

¶ 13. When reviewing a petition for a writ of *certiorari,* we review the Board's decision, not the decision of the circuit court. *See Wisconsin Power & Light Co. v. PSC,* 2009 WI App 164, ¶ 18, 322 Wis. 2d 501, 777 N.W.2d 106. Generally, our review on *certiorari* "is limited to whether the Board '(1) acted within its jurisdiction; (2) proceeded on a correct theory of law; (3) was arbitrary, oppressive, or unreasonable; or (4) might have reasonably made the order or finding that it made based on the evidence.' " *See Sliwinski v. Board of Fire and Po lice Comm'rs of Milwaukee,* 2006 WI App 27, ¶ 12, 289 Wis. 2d 422, 711 N.W.2d 271 (citation omitted). However, because Vidmar also sought review under Wis. Stat. §§ 62.50(20)-(22) in the circuit court, our *certiorari* review of the Board's decision "is limited to whether the Board kept within its jurisdiction or applied correct legal theories, because a circuit court's decision on a review sought under [§§ 62.50(20)-(22) ] upholding a Board's action 'shall be final and conclusive in all cases.' " *Sliwinski,* 289 Wis. 2d 422, ¶ 12 (citation omitted); *see also Herek v. Police & Fire Comm'n Village of Menomonee Falls,* 226 Wis. 2d 504, 510, 595 N.W.2d 113 (Ct. App. 1999) ("[because] the circuit court has already reviewed issues pertaining to the reasonableness of the Commission's actions and the sufficiency of evidence to support the Commission's actions . . . our review is limited to whether the Commission kept within its jurisdiction and whether it proceeded on a correct theory of the law."). Whether the Board kept within its jurisdiction or applied correct legal theories are questions of law we review *de novo. See Sliwinski,* 289 Wis. 2d 422, ¶ 12.

¶ 14. Vidmar makes the following arguments on appeal: (1) the Board proceeded on an incorrect theory of law; (2) the circuit court wrongly concluded that deference was owed to the Board's findings of fact and credibility determinations; and (3) the circuit court erred by applying an incorrect standard of review. We discuss each in turn.

## I. The Board Proceeded On A Correct Theory Of Law.

¶ 15. Vidmar argues that the Board proceeded on an incorrect theory of law in concluding that he violated charge three. The Board sustained charge three on the ground that Vidmar lacked the ability to enforce federal and state laws and city ordinances. The main thrust of Vidmar's argument is that charge three does not contain language referencing or implying the "capacity" to enforce federal, state, or local law.[4] Alternatively, Vidmar argues that if we conclude that the "capacity" to enforce federal, state, or local law can be subsumed within those provisions, Vidmar does not lack the capacity to enforce federal, state, or local law. We disagree.

[4] Charge three reads: "Violation of Core Value 1.00, referencing Guiding Principle 1.02: Lacking the capacity to enforce federal and state laws, and city ordinances."

Core Value 1.00 reads: "We are prudent stewards of the public's grant of authority and resources. We are accountable for the quality of our performances and the standards of our conduct. We are exemplary leaders and exemplary followers."

Guiding Principle 1.02 reads: "We cooperate with our colleagues, other agencies and citizens to ensure public safety, improve the quality of urban life, protect those who cannot protect themselves and enforce the law."

713

¶ 16. In the circuit court, Vidmar argued that there was insufficient evidence to sustain the charge that he lacked the capacity to enforce the law, and that Core Value 1.00, Guiding Principle 1.02 was not being "applied fairly and without discrimination." As discussed above, Vidmar is now precluded from challenging the sufficiency of the evidence and the reasonableness of the Board's findings. *Sliwinski*, 289 Wis. 2d 422, ¶ 12 (our review "is limited to whether the Board kept within its jurisdiction or applied correct legal theories."). Vidmar, however, appears to advance these same arguments that were disposed of by the circuit court by labeling them legal arguments. Vidmar cites no case law in support of his claim that the Board proceeded on an incorrect legal theory when it determined that the evidence established that he no longer had the capacity to enforce the law. Instead, he merely offers his interpretation of how Core Value 1.00, Guiding Principle 1.02 should be applied.

██

¶ 17. WISCONSIN STAT. § 62.50(3)(a) permits the Board to delegate its rulemaking authority to the Police Chief subject to the Board's approval. *See id.* Pursuant to this statutory provision, however, no rule proposed by the Police Chief can take effect until it has been approved by the Board. *See id.*; *see also* Board Rule II § 3(c).[5] "An administrative agency's interpretation of its own rules is controlling unless plainly erroneous or inconsistent with the language of the rule." *Marder v. Board of Regents*, 2005 WI 159, ¶ 19, 286 Wis. 2d 252, 706 N.W.2d 110.

---

[5] The Board's rules can be found at www.city.milwaukee.gov/fpc.

¶ 18. The Board's interpretation of the capacity to enforce the law, as applied to the facts of this case, is consistent with the Board's rule and is not plainly erroneous. Vidmar argues that he is still able to enforce the law because there are other officers charged with untruthfulness who continue to work as police officers. While this assertion may very well be true, we are not concerned with the situation of other officers; the issue before us in this case is Vidmar's actions and the Board's decision relative to those actions. As such, we will not address this argument further.[6]

¶ 19. Vidmar further argues that he can still function as a police officer by working administrative duties, as he did prior to being discharged. In its decision, the Board concluded that " 'enforcing the law' really implies working in the field—patrol, investigation, arrests, and the like" and that Vidmar's inability to testify rendered him "unable, as a practical matter, to enforce the law." This conclusion is supported by the testimony of Assistant Chief James Harpole, who testified that it would be "almost impossible" to find any

---

[6] Vidmar specifically references the case of Officer Daniel Culver, an officer who was charged with misconduct stemming from his own untruthfulness, yet still remains on the Department's payroll and is assigned to the Property Control Division, in an effort to show that his discharge is unreasonable. What Vidmar fails to mention, however, is that while Officer Culver was discharged by Chief Flynn, his discharge was overturned on appeal because the charges were not sustained and he was reinstated. This case illustrates the need to approach each case independently. While the Board may not have found sufficient evidence to sustain Officer Culver's discharge, the Board did find sufficient evidence to sustain Vidmar's discharge. We recognize that each case is unique and, as such, we must limit our review to the record of the case before us.

position that is "meaningful and is engaged in the actual work of a law enforcement officer without having to potentially testify in court." The Board concluded:

> This brings us to the seventh just cause standard. We reiterate that there are significant mitigating considerations in this case, as set forth in Paragraph 41. However, there is one crucial difference in our consideration of the second and third charges: we now take into account the impairment of Vidmar's ability to enforce the law. In our mind, this tips the balance decisively in favor of discharge. The harm to the Department from Vidmar's *de facto* incapacitation as a law-enforcement officer is far greater than the harm caused by the loss of the bike. Given the burdens on the Department of continuing to carry an officer on the force who cannot truly function as a police officer, we have little difficulty concluding the good of the service requires discharge. Although there is certainly plenty of back-office work to do in a police department, there are other employees available for this sort of work, including civilians, police aides, and officers in a temporary disability or suspension of police powers situation. We credit Harpole's testimony that it is not an appropriate use of Department resources to put police officers to work in this way on an indefinite basis, and that it is apt to lead to a make-work scenario. We conclude, by a preponderance of the evidence, that the seventh just cause standard is satisfied and that the good of the service requires that Vidmar be discharged.

¶ 20. We agree with the position of the Board that the capacity to enforce the laws means the capacity to engage in the full spectrum of responsibilities that an officer may be called upon to undertake. One of the most crucial of those responsibilities is giving testimony in court that is worthy of belief. If an officer's capacity to work in the field, which includes

716

giving credible testimony in court, has been permanently compromised—as is the case here with Vidmar—then his ability to engage in the full spectrum of the responsibilities of a police officer has also been compromised. In such a scenario, the officer does not have the capacity to enforce the laws. Accordingly, we conclude that the Board proceeded on a correct theory of law in concluding that Vidmar violated charge three.

## II. The Board's Findings of Fact and Credibility Determinations Are Given Deference.

¶ 21.   Vidmar argues that the circuit court erred in giving deference to the Board's findings of fact and credibility determinations. We disagree.

¶ 22.   WISCONSIN STAT. § 62.13(5)(i) "requires that the circuit court give deference to the Board's findings and credibility determinations in deciding whether '[u]pon the evidence' before the Board there was 'just cause' under the listed criteria 'to sustain the charges against' the officer." *Younglove v. City of Oak Creek Fire and Police Comm'n*, 218 Wis. 2d 133, 141, 579 N.W.2d 294 (Ct. App. 1998) (citation omitted; bracket in *Younglove*). The role of the circuit court is "to ensure that the Board's decision is supported by the evidence that the Board found credible." *See id.* at 139. "[I]f additional evidence or other material is needed, the circuit court is directed by the statute to remand to the Board for that purpose." *Id.* at 139–40.

¶ 23.   Vidmar cites no case law in support of his argument that the Board's findings of fact and credibility determinations receive no deference, and we are aware of none. *See State v. Pettit*, 171 Wis. 2d 627, 646,

492 N.W.2d 633 (Ct. App. 1992) (we may decline to review arguments that are supported only by general statements and that cite no legal authority). Vidmar, however, appears to base his argument on his assertion that the Board failed to make adequate findings or credibility determinations to support its decision, specifically with regards to Captain Howard. Vidmar further argues that because Captain Howard's testimony was "neither substantial, nor credible," any implied credibility determinations should be set aside. Vidmar's arguments are misguided.

¶ 24. First, even if we agreed the Board did not make sufficient findings of fact or credibility determinations to support its decision, the solution is not for the circuit court to ignore the evidence altogether, as suggested by Vidmar. Rather, the circuit court would be required to remand the case to the Board for further fact finding. *See Younglove*, 218 Wis. 2d at 139–40. Similarly, because our role on *certiorari* is to review the decision of the Board, *see Wisconsin Power & Light Co.*, 322 Wis. 2d 501, ¶ 18, the appropriate solution on appeal would be to remand to the Board, not set aside the Board's findings of fact and credibility determinations altogether. *See Younglove*, 218 Wis. 2d at 139–40.

¶ 25. Second, this argument appears to be an attempt by Vidmar to have us reweigh evidence. This argument, however, is no longer available to Vidmar. As discussed above, we are precluded from reviewing an evidence-based argument on appeal. *See Sliwinski*, 289 Wis. 2d 422, ¶ 12 (our review "is limited to whether the Board kept within its jurisdiction or applied correct legal theories."). Nevertheless, we disagree with the assertion that the Board failed to make sufficient findings of fact and credibility determinations.

¶ 26. In his reply brief, Vidmar argues for the first time that had the circuit court not erred in deferring to the Board's conclusions regarding evidentiary issues that "it would have concluded what the Board was scared to admit—that Captain Howard not only disciplined Officer Vidmar, but that she then lied about it in an effort to save her job (at the expense of Officer Vidmar losing his)." Not only does this argument make no reference to any portion of the record, but Vidmar is precluded from raising an argument for the first time on reply. *See Northern States Power Co. v. National Gas Co., Inc.*, 2000 WI App 30, ¶ 21 n.6, 232 Wis. 2d 541, 606 N.W.2d 613.[7]

¶ 27. Regardless, the Board sufficiently addressed Captain Howard's testimony. The Board recognized the conflicting testimony between Vidmar and Captain Howard regarding who initiated the meeting, but did not find this conflict to be a "material issue." Furthermore, the Board enumerated the five reasons upon which it based its decision that Vidmar was not disciplined by Captain Howard. It is undisputed that: (1) there was no written complaint or other documentation of charges filed as a result of the meeting; (2) no permanent record was made of the incident as a result of the meeting; (3) Internal Affairs was not contacted or asked to investigate as a result of the meeting; (4) Chief Flynn, the only person with the authority to discharge or suspend an officer without pay, had no involvement

---

[7] On April 22, 2016, the City filed a motion to strike this portion of Vidmar's argument and sought sanctions for Vidmar's failure to comply with Wis. Stat. § 809.19(1)(e). While we agree that Vidmar is precluded from making this argument for the first time on appeal, and that he failed to cite to the record, we do not feel that sanctions are warranted.

in the meeting; and (5) Vidmar concedes that the meeting "seemed hasty and off-the-cuff."

¶ 28. To the extent that Vidmar is arguing that the Board's decision failed to adequately set forth all the evidence, "[i]t is sufficient if the findings of fact and conclusions of law are specific enough to inform the parties and the courts on appeal of the basis for the decision." *State ex rel. Harris v. Annuity and Pension Bd.*, 87 Wis. 2d 646, 661, 275 N.W.2d 668 (1979). Accordingly, despite Vidmar being precluded from making an evidentiary-based argument on appeal, we conclude that the Board made sufficient findings of fact and credibility determinations to support its decision.[8] We further conclude that the circuit court did not err in giving deference to the Board's findings of fact and credibility determinations.

### III. The Circuit Court Applied The Correct Standard Of Review.

¶ 29. Finally, Vidmar argues that the circuit court erred by applying an incorrect standard of review. Specifically, Vidmar argues the circuit court's focus on the "reasonableness" of the Board's decision ignores the "just cause" standard that was implemented in 1997. We disagree.

¶ 30. To be sure, in 1997, the Wisconsin legislature created Wis. Stat. § 62.50(17)(b). *See* 1997 Wis. Act

---

[8] We note that the transcript from the Phase I hearing before the Board was over 300 pages long and included testimony from thirteen witnesses. While we are not required to reweigh the evidence, our review of this transcript, as well as the record as a whole, supports our conclusion that the Board made sufficient findings of fact and credibility determinations to support its decision.

237, § 276i. This subsection required the Board to apply the seven just cause standards enumerated in § 62.50(17)(b) when deciding disciplinary appeals brought by police officers. *See id.* The legislature also amended § 62.50(21) to reflect the creation of § 62.50(17)(b). *See* 1997 Wis. Act 237, § 276k. Specifically, the language of the question posed on statutory appeal was changed from ' "Under the evidence was the decision of the Board reasonable?" ', *see* § 62.50(21) (1995–96), to ' "Under the evidence is there just cause, as described in sub. (17)(b), to sustain the charges against the accused?" ' Sec. 62.50(21).

¶ 31.   Vidmar, however, appears to exaggerate the circuit court's reliance on "pre-just cause" cases. In fact, the circuit court only cited one "pre-just cause" case, *Clancy v. Board of Fire & Police Comm'rs of Milwaukee*, 150 Wis. 630, 138 N.W. 109 (1912). The circuit court cited this case for the proposition that its review is a limited review "directed to the reasonableness of the Board's decisions." The circuit court also cited *Clancy* for the proposition that its function on the statutory appeal is to "decide whether the Board performed the duty imposed upon it by law," and the fact that the court might have reasoned a different conclusion is not grounds for reversal. Standing alone, each of these statements is a correct statement of law as it applies to a circuit court review of the sufficiency of the evidence to sustain the just cause determinations of the Board. Regardless of the citation to *Clancy*, consideration of the circuit court's complete decision makes it clear that it understood its role and applied the correct standard of review.

¶ 32.   The circuit court enumerated the just cause standards and then proceeded to address the sufficiency of the evidence to support each of the three just

cause standards—four, five, and six—implicated in Vidmar's statutory appeal.[9] The decision illustrates that the circuit court thoroughly considered each one of the just cause standards in light of Vidmar's arguments and, citing the Board's decision, concluded there was sufficient evidence in the record to support the Board's determination that the fourth, fifth, and sixth just cause standards had been met. As a result, the circuit court affirmed the Board's conclusion that Vidmar did not have the capacity to enforce the law.

¶ 33.    Other than merely alleging that the circuit court applied the wrong standard of review, Vidmar does not develop his argument. Nor does he specify how this alleged error would have affected the outcome of the circuit court's review. Nevertheless, under Wis. Stat. § 62.50(21), the circuit court's review is limited as

---

[9] The seven just cause standards articulated in Wis. Stat. § 62.50(17)(b) are as follows:

1. Whether the subordinate could reasonably be expected to have had knowledge of the probable consequences of the alleged conduct.

2. Whether the rule or order that the subordinate allegedly violated is reasonable.

3. Whether the chief, before filing the charge against the subordinate, made a reasonable effort to discover whether the subordinate did in fact violate a rule or order.

4. Whether the effort described under subd. 3 was fair and objective.

5. Whether the chief discovered substantial evidence that the subordinate violated the rule or order as described in the charges filed against the subordinate.

6. Whether the chief is applying the rule or order fairly and without discrimination against the subordinate.

7. Whether the proposed discipline reasonably relates to the seriousness of the alleged violation and to the subordinate's record of service with the chief's department.

follows: "In determining the question of fact presented, the court shall be limited in the review thereof to the question: 'Under the evidence is there just cause, as described in sub. (17)(b), to sustain the charges against the accused?' " It is clear from its written decision that the circuit court knew what standard of review to apply and applied it correctly. Accordingly, we conclude that the circuit court applied the correct standard of review.

¶ 34. For the foregoing reasons, we affirm.

*By the Court.*—Order affirmed.